IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ANGELA WILLIAMS                    )
                                   )
              Plaintiff,           )
                                   )
    v.                             )        C.A. No. 12-1098-GMS
                                   )
MICHAEL J. ASTRUE,[1]              )
COMMISSIONER OF                    )
SOCIAL SECURITY                    )
                                   )
              Defendant            )

## MEMORANDUM

## I.    INTRODUCTION

This action arises from the denial of plaintiff Angela Williams' ("Williams") claim

for Social Security benefits.  On May 27, 2009, Williams filed an application for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act").

(D.I. 5 at 9, 71.)  Her claims for disability were denied initially on February 8, 2010, and

upon reconsideration on May 6, 2010.  (*Id.* at 9.)  Williams requested a hearing before

an administrative law judge ("ALJ"), which was held January 11, 2011.  (*Id.*)  On

February 9, 2011, the ALJ issued a decision finding Williams was not disabled under

the Act.  (*Id.* at 6-20.)  The Appeals Council denied her request for review, and the

ALJ's opinion became the final decision of the Commissioner of Social Security

--------

[1] Carolyn W. Colvin became the Commissioner of Social Security
("Commissioner") on February 13, 2013, after briefing began.  Although under Federal
Rule of Civil Procedure 25, Carolyn W. Colvin should be substituted for Michael J.
Astrue, pursuant to 42 U.S.C. § 405(g), no further action is necessary to continue this
action.

("Commissioner") on July 11, 2012. (*Id.* at 1.) Presently before the court are the

parties' cross-motions for summary judgment. For the reasons below, the court will

grant in part and deny in part Williams' motion (D.I. 11.) and grant in part and deny in

part the Commissioner's motion. (D.I. 12.)

## II.   BACKGROUND

Williams was born May 30, 1967 and was forty-one years old when she filed  for

DIB on May 27, 2009. (D.I. 5 at 71.) She has a high school education, and previously

worked as a cashier and a certified nurse's assistant ("CNA"). (*Id.* at 30, 33.) In her

application and disability report, Williams claimed disability beginning November 6,

2006,[2] due to a workplace injury sustained in June 2006. (*Id.* at 31-32.) To qualify for

DIB, Williams must demonstrate that she is disabled within the meaning of §§ 216(i)

and 223(d) of the Act. (*Id.* at 10.)

### A.   Medical Evidence Presented

#### 1. Delaware Back Pain

Williams saw Dr. Ginger Chiang, M.D. ("Dr. Chiang"), of Delaware Back Pain &

Sports Rehabilitation Centers ("Delaware Back Pain") on March 7, 2008. (*Id.* at 368.)

She was referred to Dr. Chiang by Dr. Arnold Glassman, D.O. ("Dr. Glassman"), also of

Delaware Back Pain, who began treating Williams in July 2006.[3] (*Id.* at 60, 361.) Her

---

[2] Based on an earlier application, Williams was granted a closed period of disability from November 6, 2006 through March 5, 2008. (D.I. 5 at 9.) She agreed to this closed period disability at the "insistence of her attorney." D.I. 11 at 1. A closed period of disability or "closed period" cases are where a disability claimant is found to be disabled for a finite period of time. *Shepard v. Apfel*, 184 F.3d 1196, 1198 (10th Cir. 1999).

[3] Though Dr. Glassman began treating Williams in July 2006 (*Id.* at 60), the medical evidence before the court begins on March 7, 2008. (*Id.* at 368-74.)

2

chief complaint was pain in the upper and lower back, neck pain, and stiffness down the right leg. (*Id.* at 368.) Williams indicated that her pain increased with postural changes, housework, and laying flat on her stomach. (*Id.*) Additionally, she reported numbness or tingling down the right leg and weakness of the right arm. (*Id.*) Her pain improved with physical therapy and chiropractic treatment. (*Id.* at 369.) At the time of the 2008 visit, Williams was taking Xanax, Zoloft, and Percocet, although she related the medications did not improve pain and produced drowsiness, mood swings, and constipation. (*Id.*) Williams noted a past medical history of depression. (*Id.*) Past surgeries included carpal tunnel, right rotator cuff, and right trigger thumb. (*Id.*)

Dr. Chiang administered trigger point injections to Williams' lower back. (*Id.* at 362.) Progress notes show she reported no leg pain after the injections. (*Id.* at 383.) Her follow-up appointments with Dr. Glassman occurred nearly every month from March 2008 to March 2010. (*Id.* at 188, 191-387, 409-430.)

At her April 23, 2008 visit with Dr. Glassman, Williams completed a patient follow-up history. (*Id.* at 350.) Her chief complaints were right shoulder, neck, and back pain, daytime sleepiness, headache, weakness, anxiety/panic, nervousness, mood changes, and tension. (*Id.*) Housework increased her pain; rest and medication improved it. (*Id.*) She also completed a pain and function self-assessment, listing current pain 5/10; average pain 7-8/10; worst pain since last visit 7-8/10. (*Id.* at 351.) Pain completely interfered with work, sleep, participation in social activities, and sexual activities. (*Id.*) Finally, Williams reported medication side effects of constipation, trouble sleeping, and difficulty with concentration. (*Id.*)

3

Williams completed a patient follow-up history and a pain and function self-assessment on each of her subsequent monthly visits to Dr. Glassman. (*Id.* at 193-352, 409-30.) With little deviation, her follow-up histories and self-assessments remained stable for the duration of her treatment with him.[4] (*Id.* at 309-10, 303-04, 295-96, 289-90, 280-81, 274-75, 268-69, 262, 266, 252-53, 243-44, 236-37, 225-26, 215-16, 210-11, 204-05, 193-94, 409-10, 420-21, 426-27.)

Dr. Glassman completed a physical exam at each monthly visit[5] and consistently noted right carpal tunnel syndrome; chronic second degree strain and sprain of the cervical, lumbar, and thoracic spine; right shoulder pain; tenderness of the right wrist; spinal tenderness; normal coordination; normal/non-antalgic gait; and depression/anxiety. (*Id.* at 352-54, 311-13, 305-07, 297-99, 286-89, 282-84, 276-78, 263-65, 254-56, 245-47, 238-240). Beginning with the August 26, 2009 visit and continuing to March 17, 2010, Dr. Glassman also noted somatic dysfunction. (*Id.* at 227-29, 217-19, 212-14, 206-08, 195-97, 411-13, 422-24, 428-30.) He recorded left Tinel's sign on three occasions,[6] and diagnosed bilateral carpal tunnel on the last visit. (*Id.* at 353, 412, 413, 424.)

Beginning with the May 26, 2009 visit and continuing to the latest report from Dr.

---

[4] Williams reported general improvement in function during her October 22, 2008 visit. (*Id.* at 304.) She further reported significant improvement with sleep on July 29, 2009 (*id.* at 237), September 24, 2009 (*id.* at 216), and October 21, 2009. (*Id.* at 211.) However, she never rated symptom interference below 6/10. (*Id.* at 193-352.)

[5] Williams saw Physician's Assistant Richard A. Falcioni, at Delaware Back Pain on October 21, 2009. (*Id.* at 210-14.)

[6] Tinel's sign is a test used to diagnose carpal tunnel syndrome. *Carpal Tunnel Syndrome*, WebMD, http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited Sept. 16, 2015).

4

Glassman, Williams was prescribed Cymbalta, Oxycontin, and Xanax. (*Id.* at 191-260, 409-430.) During that time, Dr. Glassman consistently noted no adverse side effects and reported the medication helped. (*Id.*) He recorded no impairment and noted improvement in Williams' activities of daily living ("ADLs"). (*Id.* at 194, 409, 420.)

Dr. Glassman completed a functional capacities assessment for The Hartford Insurance Company.[7] (*Id.* at 433-34.) His primary diagnosis was a cervicothoracic lumbosacral spine injury with secondary diagnoses of carpal tunnel syndrome, right shoulder impingement, and major depression. (*Id.* at 433.) His physical findings were decreased range of motion because of pain and decreased function of the right upper extremity. (*Id.*) Dr. Glassman's current treatment plan included pharmacologic therapy and a home exercise program. (*Id.*) He concluded Williams could sit for six to eight hours, but not more than one hour at a time; stand for one to two hours, but not more than twenty minutes at a time; and walk for one hour, but not more than fifteen minutes at a time, with frequent stretch breaks. (*Id.* at 434.)

Dr. Glassman further indicated Williams could not lift any weight with her right arm, and not more than ten pounds occasionally with her left arm.[8] (*Id.*) He noted Williams should never crouch or kneel and could occasionally bend at the waist and drive. (*Id.*) Her additional restrictions were to never reach above shoulder or below waist levels with her right arm, occasionally reach above shoulder and below waist levels with her left arm, and at waist/desk level with both arms and occasionally handle

---

[7] The date of this assessment is unknown, but it likely occurred between December 16, 2009 and January 13, 2010. (D.I. 5 at 433.)

[8] "Occasionally" is defined as 1-33% of the time. (*Id.* at 434.)

5

and finger with both hands. (*Id.*)  Dr. Glassman concluded Williams was totally disabled due to physical injuries and depression. (*Id.*)

Dr. Glassman reported that Williams cried in his office (*id.* at 227, 254, 305, 311), but at other times, her mood and affect were normal.[9] (*Id.* at 195, 206, 212, 217, 227, 238, 245, 270, 276, 282, 372, 411, 422.)  He routinely found her orientation of person, place, and time as normal.[10] (*Id.* at 195, 206, 212, 217, 227, 238, 245, 254, 263, 270, 276, 282, 297, 352, 372, 411, 422.)

Williams underwent psychological therapy sessions from Dr. Fisher, who noted depression and anxiety secondary to chronic pain. (*Id.* at 230, 248, 249, 250.)  Dr. Fisher encouraged changes in diet, exercise, and adding structure to daily life. (*Id.* at 249.)

### 2. Drs. Borek and Singh

Dr. M. H. Borek, D.O. ("Dr. Borek"), a State agency medical consultant, completed a Physical Residual Functional Capacity Assessment on February 10, 2010, finding Williams could occasionally lift and/or carry ten pounds; frequently[11] lift and/or carry five pounds; stand and/or walk at least two hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday, with limited upper extremity ability to push and/or pull. (*Id.* at 391.)  Regarding postural limitations, Williams could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but should never climb ladders, ropes, or scaffolds. (*Id.* at 391-92.)  She had limited reaching in all

---

[9] On March 7, 2008, Williams was examined by Dr. Chiang. (*Id.* at 372.)
[10] See note 9, *supra.*
[11] "Frequently" is defined as 34-67% of the time.  (D.I. 5 at 434.)

6

directions (including overhead), limited handling and fingering, and unlimited feeling. (*Id.* at 392.) No visual or communicative limitations were found. (*Id.* at 392-93.) Dr. Borek noted Williams should avoid concentrated exposure to extreme cold, vibration, and hazards. (*Id.* at 393.) He concluded she was capable of sedentary work with frequent, but not constant, hand manipulation. (*Id.* at 396.) On May 5, 2010, Dr. Nisha Singh, MD ("Dr. Singh"), another State agency medical consultant, affirmed Dr. Borek's findings. (*Id.* at 432.)

### 3. Drs. King and Ferreira

Christopher King, Psy.D. ("Dr. King"), a State agency medical consultant, completed a Psychiatric Review Technique on February 7, 2010. (*Id.* at 398.) Dr. King found no severe impairment (*id.*), but diagnosed depressive disorder and anxiety. (*Id.* at 400-02.) He found no restrictions on activities of daily living, mild limitations in social functioning, concentration, persistence, and pace, and no episodes of decompensation. (*Id.* at 406.) On April 19, 2010, Pedro M. Ferreira, Ph.D., M.B.A. ("Dr. Ferreira"), also a State agency medical consultant, affirmed Dr. King's assessment. (*Id.* at 431.)

### B. Hearing Testimony

At the administrative hearing before ALJ Melvin D. Benitz on January 11, 2011, Williams appeared without counsel. (*Id.* at 26.) She advised the ALJ the evidence did not contain a medical record of Dr. Glassman prepared the week before the hearing. (*Id.* at 28.) Because Williams was granted a closed period of disability from November 6, 2006 to March 5, 2008, the ALJ modified the onset date to March 6, 2008. (*Id.* at 28-29.)

7

### 1.    Williams Testimony

Williams testified she is five feet and one inch tall, weighing 195 pounds, age

forty two years old,[12] single with three adult children. (*Id.* at 29-31.) She has a twelfth

grade education and is a CNA. (*Id.* at 30.) She lives in her home with her daughter and

two grandchildren, age four and eleven months. (*Id.* at 40.) The grandchildren's father,

Williams' son, is incarcerated, and the mother is "around."[13] (*Id.* at 40-41.) She is

unemployed, but receives biweekly workman's compensation payments of $213.80 and

monthly long-term disability insurance payments of $832.00. (*Id.* at 31.) Previously,

she worked at State Hospital as a CNA. (*Id.* at 32.)

Williams was injured on the job in June 2006 when a patient fell on her, causing

injuries to her neck, back, right shoulder, and both hands. (*Id.* at 32-33.) She cannot

work because of pain and medication side effects. (*Id.* at 33.) She underwent regular

physical therapy, which provided short term relief, along with a personal TENS unit.[14]

(*Id.* at 34.) She additionally claimed headaches four times per week of two to three

hour duration. (*Id.* at 34-35.) Williams takes Oxycontin and Cymbalta, which cause dry

mouth, fatigue, constipation, nausea, vomiting, and dizziness. (*Id.* at 35-36.) Her

symptoms of depression include low energy, low drive, and mood swings. (*Id.* at 36.)

---

[12] Since her birth date is May 30, 1967, she was 43 years old at the time of the hearing. (*Id.* at 30.)

[13] "She's, she's around, sir, in Wilmington, here, there, and everywhere, sir." (*Id.* at 41.)

[14] Transcutaneous electrical nerve stimulation (TENS) is a therapy that uses low-voltage electrical current for pain relief. *Transcutaneous Electrical Nerve Stimulation (TENS) - Topic Overview*, WebMD, http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nerve-stimulatio n-tens-topic-overview (last visited Sept. 23, 2015).

8

Although she was previously granted a closed period of disability on the basis that her condition improved, her condition remained the same and the pain worsened. (*Id.* at 37.) She did not want the previous closed period of disability, but her previous attorney refused to represent her if she did not accept it. (*Id.*) She is seeking a continuing period of disability. (*Id.* at 37-38.)

Williams claimed limited range of motion, with pain radiating downwards from the back of her head. (*Id.* at 39.) She can lift ten pounds, limited by right shoulder impingement. (*Id.* at 38.) She can stand about an hour, walk twenty minutes to a half hour, and sit a half hour to forty minutes. (*Id.* at 39.) She does not cook her own meals and occasionally does household chores. (*Id.* at 40.)

### 2. Vocational Expert's Testimony

A vocational expert, James Michael Ryan ("Dr. Ryan") testified at the hearing. (*Id.* at 42.) The VE acknowledged Williams' previous work as a CNA, but noted she performed at the heavy exertional level, while her former employment is usually rated at the medium level. (*Id.*) In response to the ALJ's hypothetical of an individual having the same physical, mental, and emotional ailments, and medication side effects as Williams, the VE testified this hypothetical person was capable of light exertional unskilled work as a laundry worker; machine tender; and packer and packaging worker, and sedentary unskilled work as a small parts inserter; finish machine tender, and grading and sorting worker. (*Id.* at 42-44.)[15]

---

[15] The VE testified that his examples were not an exhaustive list. (D.I. 5 at 44.)

The VE also confirmed all jobs are SVP 2.[16] (*Id.* at 44-45.) The VE also defined sedentary and light work. (*Id.* at 45.) He confirmed his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), supplemented by knowledge and experience. (*Id.* at 45-46.) He further testified the hypothetical individual would be unable to return to previous work due to exertional and skill requirements. (*Id.* at 46.)

The ALJ then explained to Williams the manner in which he questioned the VE and that she could question the VE, suggesting she ask about the limitations from her impairments. (*Id.* at 46-47.) Williams stated she might miss two to three days of work per week, to which the VE responded that such absenteeism rate would render her unable to work. (*Id.* at 47.)

### C. The ALJ's Findings

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled:

> [The Commissioner] determines first whether an individual is currently engaged in substantial gainful activity. If that individual is engaged in substantial gainful activity, he will be found not disabled regardless of the medical findings. 20 C.F.R. § 404.1520(b). If an individual is found not to be engaged in substantial gainful activity, the [Commissioner] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. 20 C.F.R. § 404.1520(c). If the [Commissioner] determines that the claimant suffers from a severe impairment, the [Commissioner] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. 20 C.F.R. § 404.1520(d). If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [Commissioner] must determine if the individual was capable of performing in his past relevant

---

[16] In explaining the meaning of SVP2, the VE testified "SVP: 2 would require the individual to have a brief period of demonstration and/or shown how to perform the jobs, up to and including 30 days." (D.I. 5 at 45.)

work considering his severe impairment. 20 C.F.R. § 404.1520(e). If the [Commissioner] determines that the individual is not capable of performing his past relevant work, then he must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy. 20 C.F.R. § 404.1520(f).

*West v. Astrue*, C.A. No. 07–158, 2009 WL 2611224, at *5 (D. Del. August 26, 2009)

(quoting *Brewster v. Heckler*, 786 F.2d 581, 583–84 (3d Cir. 1986)).  Based on the

factual evidence and the testimony of Williams and Dr. Ryan, the ALJ determined she

was not disabled and, therefore, ineligible for DIB.  (D.I. 5 at 20.)  The ALJ's findings of

February 9, 2011 are summarized as follows:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2.      The claimant has not engaged in substantial gainful activity since March 6, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: right shoulder impingement, rotator cuff tear, degenerative disc disease, bilateral carpal tunnel syndrome, depression, anxiety and obesity (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  The claimant can stand for 30 minutes, and sit for 30 minutes, consistently on an alternate basis, for 8 hours a day, 5 days a week.  The claimant should avoid heights, hazardous machinery, and stair climbing.  The claimant can perform work that requires no fine dexterity or fine manipulation with right upper extremity.  The claimant could perform simple, unskilled, work, svp 2 in nature, low concentration, low memory, low stress, meaning jobs that have no changes in the workplace or judgment to speak of, simple one and two step tasks.

11

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on May 30, 1967 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 6, 2008, through the date of this decision (20 CFR 404.1520(g)).

(*Id.* at 11-20)

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties move for summary judgment.  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party[,]' but [refraining from] weighing the evidence or making credibility determinations." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation omitted).  If "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d

12

Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

This standard does not change merely because there are cross-motions for summary judgment. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). "The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

## B. Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of an ALJ's decision. The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not contain substantial evidence to support the decision. Factual findings are upheld if supported by substantial evidence. *See* 42 U.S.C. §§405(g); *see also Monsour Med. Ctr. v. Heckle*, 806 F.2d 1185, 1190 (3d Cir. 1986). Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

13

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the decision nor re-weigh the evidence of record. *Monsour*, 806 F.2d at 1190. The court's review is limited to the evidence that was actually presented to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). The Third Circuit has explained that a:

> single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the court would have decided the case differently, it must defer to and affirm the ALJ so long as the decision is supported by substantial evidence. *Monsour*, 806 F.2d at 1190-91.

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision." *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011). In *SEC v. Chenery Corp.*, the Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." 332 U.S. 194, 196 (1947). "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to

14

be a more adequate or proper basis." *Id*. The Third Circuit has recognized the

applicability of this finding in the Social Security disability context. *Fargnoli v.*

*Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001). This court's review is limited to the four

corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa.

2005). In Social Security cases, the substantial evidence standard applies to motions

for summary judgment brought pursuant to FED. R. CIV. P. 56. *See Woody v. Sec'y of*

*the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## IV.    DISCUSSION

### A.    Parties' Contentions

Williams maintains the ALJ erred in denying her application for DIB because the

ALJ failed to assist an unrepresented and mentally impaired claimant in developing the

administrative record. (D.I. 11-1 at 1.) She further contends the ALJ failed to properly

accommodate her neck, shoulder, hand, and arm impairments, and erred in assessing

her activities of daily living. (*Id.* at 1-2.) Finally, Williams argues the ALJ failed to

consider the side effects of her medications. (*Id.*) The Commissioner maintains the

ALJ fulfilled his duty, adequately accounted for work-related limitations, and properly

assessed the credibility of subjective complaints. (D.I. 13 at 1-2.)

### B.  Disability Analysis

Title II of the Social Security Act, 42 U.S.C. § 423(a)(l)(D), "provides for the

payment of insurance benefits to persons who have contributed to the program and

who suffer from a physical or mental disability." *Bowen*, 482 U.S. at 140. In order to

qualify for DIB, the claimant must establish she was disabled prior to the date she was

15

last insured. *See* 20 C.F.R. § 404.131. A "disability" is defined as the inability to do substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death or has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(I)(A). To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

### 1.   The ALJ's Duty to Williams

Williams maintains the ALJ failed to fulfill his duty on behalf of an unrepresented and mentally disabled claimant to conduct a full and fair administrative hearing and fully develop the record. (D.I. 11-1 at 4.)

### a.   Duty to an Unrepresented and Mentally Disabled Claimant

Williams asserts the ALJ owes a heightened duty to an unrepresented and mentally ill claimant. "The fact that a claimant is unrepresented by counsel and has knowingly waived this right is not alone sufficient for remand. However, if it is clear that the lack of counsel prejudiced the claimant or that the proceeding was marked by unfairness due to the lack of counsel, this is sufficient for remand, or reversal." *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980) (internal citation omitted). "An ALJ owes a duty to a pro se claimant to help him or her develop the administrative record." *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). The ALJ has a heightened level of care and responsibility to assume a more active role when a

claimant is unrepresented. *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979). "When a claimant is both unrepresented and suffers from a mental impairment . . . the ALJ's duty to carefully develop the record is even greater." *Ransom v. Bowen*, 844 F.2d 1326, 1330 n.4 (7th Cir. 1988).

The facts do not support her contention. Williams claims the ALJ failed to notify her of key elements of her right to representation, including fee structures and finding representation. (D.I. 11-1 at 7.) The agency informed Williams of her right to counsel on numerous occasions before, during, and after the hearing. (D.I. 5 at 7, 26, 86, 88, 90, 96, 101.) Williams indicated her understanding of that right (*id.* at 26, 77, 85) and waived her right to representation at the hearing. (*Id.* at 109.) The agency repeatedly provided her with information regarding agency approval of fee agreements for private counsel, and names, addresses, and telephone numbers to obtain free legal aid. (*Id.* at 7, 86-91.) In light of the agency's prior notifications, any purported error that the ALJ did not directly notify Williams of the same is harmless.

Williams contends the ALJ had a heightened duty to a mentally impaired plaintiff relying on *Thompson v. Sullivan*, 933 F.2d 581 (7th Cir. 1991). (D.I. 11-1 at 4.) The plaintiff in *Thompson* was diagnosed with chronic alcoholism and an adjustment disorder with depressed mood. 933 F.2d at 583. There the ALJ failed to inquire as to the limitations imposed by the plaintiff's alcoholism and mental impairments. *Id.* at 587. The court found the ALJ failed to meet a heightened duty owed to the plaintiff to develop the record, and remanded the claim. *Id.* at 588.

In the instant matter, the ALJ inquired as to Williams' depression, asking for

17

symptoms and causes. (D.I. 5 at 35-36.) The ALJ further instructed Williams to include limitations stemming from her mental impairment in her questioning of the VE. (*Id.* at 47.) Unlike *Thompson*, here the ALJ discussed Williams' mental impairments and assisted her in developing the record, and, thus, met his obligation.

### b. Duty to Fully and Fairly Develop the Record

Williams argues the ALJ failed to conduct a full and fair hearing and fully develop the record. An ALJ has a duty to "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality) (dicta). "An ALJ owes a duty to a *pro se* claimant to help him or her develop the administrative record. When a claimant appears at a hearing without counsel, the ALJ must scrupulously and conscientiously probe into, inquire of and explore for all the relevant facts." *Reefer*, 326 F.3d at 380 (internal quotations omitted). A hearing may be characterized as unfair "due to the failure of the ALJ to develop the record." *Livingston*, 614 F.2d at 345. "However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994).

Here, the ALJ fully developed the record. Williams has shown no prejudice or unfairness resulting from her pro se status. The ALJ questioned Williams on her impairments and their effect on her ability to work, her medication and side effects, daily activities, treatment history, financial status, family life, the prior administrative hearing, and physical exertional limits. (D.I. 5 at 26-41.) Finally, the ALJ gave Williams the

opportunity to include any additional information.[17]   The ALJ instructed her on

questioning the vocational expert, noting the questions should address the limitations

resulting from her impairments. (*Id.* at 46, 47.)  The ALJ also instructed Williams on her

right to elicit testimony from the VE challenging the ALJ's questioning. (*Id.* at 46.)

Williams takes exception to the ALJ's decision not to ask the VE follow-up

questions, but cites no law or procedure requiring him to do so. (D.I. 11-1 at 5.)  She

asserts this is error, citing omissions from the hypothetical and shortcomings in her own

questioning of the VE.[18] (*Id.*)  The hypothetical, however, noted a claimant with fatigue,

mood swings, social limitations, and manipulative limitations of the right upper

extremity. (D.I. 5 at 43.)  Her examination of the VE mentioned bilateral carpal tunnel,

but did not include bilateral manipulative impairment in relation to work (*id.* at 47), or her

response to the ALJ's question on lifting limitations. (*Id.* at 38.)  The hypothetical posed

by the ALJ, along with Williams' examination, was thus inclusive of her limitations, and

follow-up questions were not necessary.

Williams further urges that the record is incomplete because a medical report

had not been submitted to the ALJ before the hearing.[19] (D.I. 11-1 at 6.)  Williams fails,

however, to specify any prejudice suffered from a lack of this evidence.  Williams did

not provide the evidence to the ALJ or to the Appeals Council.  She never indicated

---

[17] "Q.  Okay.  Is there anything else you want to tell me about your situation, Ms.
    Williams, that I haven't asked you or you volunteered?
    A.  No, sir, I've told you everything, sir." (D.I. 5 at 41.)

[18] Williams contends the questioning omitted consideration of drowsiness or
pain, social limitations from mood swings, and manipulative restrictions. (D.I. 11-1 at
5.)

[19] At the hearing, the ALJ asked Williams to submit the medical record to him.
(D.I. 5 at 28.)

what this medical record is, its significance, or why it was error for the ALJ to proceed without it.[20]

Williams lastly asserts ALJ improperly failed to explain his legal basis for amending the alleged onset date at the hearing. (*Id.* at 6.) She does not dispute the propriety of the amendment, but the procedure. The ALJ's procedure is not actionable error.[21]

### 2. The ALJ's RFC Finding

Williams argues the ALJ's residual functional capacity (RFC) assessment is unsupported by substantial evidence because it failed to accommodate her hand, neck, and arm impairments, social impairments, and resulting limitations. (*Id.* at 5 n.1, 7.) Defendant contends the RFC finding is adequately supported. (D.I. 13 at 12.)

#### a. Physical Impairments

Williams maintains the ALJ improperly found that, regarding her arm and hand use, she was capable of frequently lifting ten pounds and occasionally twenty pounds, with no limitations for left carpal tunnel syndrome, despite finding this condition was severe. (D.I. 11-1 at 7.) The ALJ also found while the impairments cause some functional limitations, "the moderate clinical findings, conservative treatment, and extensive activities of daily living shown in the record are not consistent with total

---

[20] "The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g). As Williams has made no showing of materiality, new or additional evidence is not required.

[21] The court may not impose procedures upon an administrative agency. *See Vermont Yankee Nuclear Power Corp. v. N.R.D.C,* 435 U.S. 519, 549 (1978).

disability." (D.I. 5 at 16.)  The ALJ did note chronic right shoulder and moderate neck

and back pain, and made adequate allowance for these conditions by limiting her to

light work,[22] sitting or standing for only thirty minutes at a time, and minimal pushing and

pulling, with no exposure to heights, hazardous machinery, or stair climbing, and no

requirement of fine dexterity or manipulation (*Id.* at 16-17.)

The ALJ notes in his RFC finding the weight assigned to and his reasoning for

each treating opinion.  (*Id.* at 17-18.)  An ALJ's findings of fact must be taken as

conclusive when supported by substantial evidence.  *Van Horn v. Schweiker*, 717 F.2d

871, 873 (3d Cir. 1983).  However, while the court finds the ALJ adequately

accommodated her impairments, his decision to assign no weight to Dr. Glassman's

opinions lacks support and is contrary to the evidence.  "The grounds upon which an

administrative order must be judged are those upon which the record discloses that its

action was based."  *SEC v. Chenery*, 318 U.S. 80, 87 (1943).[23]  A district court may not

affirm an administrative decision by substituting more appropriate grounds.  *Chenery*,

332 U.S. at 196; *Fargnoli*, 247 F.3d at 44 n.7.

The ALJ's decision to afford no weight to Dr. Glassman's multi-year treatment

relationship is unsupported by substantial evidence.  The ALJ, in justifying his decision,

notes "Dr. Glassman's opinions are conclusory, primarily based on claimant's subjective

complaints and outside of his range of expertise as Dr. Glassman's specialty is Physical

Medicine and Rehabilitation and he retains no specialization in Psychiatry."  (D.I. 5 at

---

[22] 20 CFR 404.1567(b) defines light work as "lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to 10 pounds."

[23] The Commissioner, in his brief, relies heavily on Dr. Glassman's medical
findings in arguing the RFC finding is properly supported.  (D.I. 13.)

18.)  The ALJ discusses the factors in evaluating treating source opinions,[24] but ultimately ignores them because Dr. Glassman's opinions are "conclusory".  (*Id.*)  The ALJ seemingly rejects more than two years of treatment evidence.  The doctor opined that Williams was totally disabled.  Given his opinion and the length and nature of the treatment he provided, it may well be the case that this evidence would be sufficient to provide the detailed, longitudinal picture of impairments described in 20 CFR § 404.1527(c)(2).  While determination of disability rests with the ALJ, he may not ignore the underlying evidence because it led to a conclusion.  *See* §§ 404.1527(d)(1)-(2).  Similarly he may not discount the entire treatment relationship because a physician gave an opinion outside his expertise.  While the ALJ properly affords little weight to Dr. Glassman's psychiatric opinions, this does not warrant rejection of *all* of Dr. Glassman's opinions.  Dr. Glassman's assessments of Williams' physical impairments are within his specialty of physical medicine and rehabilitation.

"Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone."  SSR 96-8p, 1996 WL 374814 at *5.  That Dr. Glassman noted Williams' subjective descriptions of pain and evaluated them is not grounds for discounting his opinion.  On each visit, Dr. Glassman performed objective physical tests, including range of motion and for carpal tunnel syndrome.  (*See e.g.* D.I. 5 at 195-96.)  The ALJ's failure to give any weight to

---

[24] Examining relationship; treatment relationship; (namely, length and nature and extent of treatment relationship); supportability; consistency with the record; and specialization.  20 C.F.R. § 404.1527(c).

22

Dr. Glassman's objective and subjective assessments of Williams' impairments and medical conditions was in error.

### b. Mental Impairments

Williams contends the ALJ's RFC finding fails to incorporate any social limitations despite a finding of moderate social difficulty. (D.I. 11-1 at 5 n.1.) "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184 at *5. The ALJ found Williams had moderate difficulties in social functioning and severe mental impairments (D.I. 5 at 13, 17); the RFC assessment only includes limitations related to mental impairments.[25] It fails to address her reported problems of getting along with family, friends, neighbors, and others due to mood swings, conditions determined at step 3 of the 5 step process. (*Id.* at 13) The effect of these impairments, though not severe, merits discussion in the RFC analysis. Accordingly, the RFC finding is incomplete and not supported by substantial evidence.

As a result, the matter should be remanded for the ALJ to elaborate upon the elements of 20 C.F.R. §404.1527(c) regarding the appropriate weight afforded to Dr. Glassman, a treating physician, and fully address Williams' social limitations.

### 3. Williams' Subjective Complaints

Williams alleges the ALJ erred in assessing her activities of daily living (ADLs) and her reports of side effects from medication. (D.I. 11-1 at 10, 12.) The ALJ found

---

[25] "Simple, unskilled work . . . low concentration, low memory, low stress, meaning jobs that have no changes in the workplace of judgment to speak of, simple one and two step tasks." (D.I. 5 at 13-14.)

23

her extensive ADLs were not consistent with total disability. (D.I. 5 at 16.)  The ALJ

further found Williams' "statements concerning the intensity, persistence and limiting

effects of these symptoms are not credible to the extent they are inconsistent with the .

. . residual functional capacity assessment." (*Id.* at 15.)

### a.    Activities of Daily Living

Williams argues the ALJ erred in finding a mild restriction to activities of daily

living because the conclusion contradicts her reports. (D.I. 11-1 at 11.)  The

Commissioner, however, identifies in her brief, inconsistencies in her ADL reports. (D.I.

13 at 16.)[26] *See* SSR 96-7p, 1996 WL 374186 at *5 ("One strong indication of the

credibility of an individual's statements is their consistency, both internally and with

other information in the case record.")  The ALJ's RFC determination provides no

rationale,[27] (D.I. 5 at 15) with the justification for the credibility finding appearing only in

the Commissioner's brief. (D.I. 13 at 15-16.)  This lack of any articulation in the RFC

assessment renders the finding unsupported by substantial evidence.

### b.    Side Effects of Medication

Williams lastly alleges the ALJ failed to properly consider the side effects of her

pain medications.[28]  The ALJ is required to consider "[t]he type, dosage, effectiveness,

---

[26] The medication improved her ability to care for her children, grandchildren, and
mother (*id.* at 204); the pain medication was effective at relieving pain (*id.* at 243); she
could do housework and light shopping. (*Id.* at 111.)  Williams, however, reported she
relied on her mother and daughter for meal preparation and shopping. (*Id.* at 161-62.)

[27] "The reasons for the credibility finding must be grounded in the evidence and
articulated in the determination or decision.  It is not sufficient to make a conclusory
statement that 'the individual's allegations have been considered' or that 'the allegations
are (or are not) credible.'" SSR 96-7P, 1996 WL 374186 at * 4.

[28] Side effects include dizziness, dry mouth, fatigue, and vomiting. (D.I. 5 at 15.)

24

and side effects of any medication . . . ." 20 C.F.R. § 404.1529(c)(3)(iv).  The record is
replete with subjective complaints of side effects.  (D.I. 5 at 191-387, 409-30.)  Dr.
Glassman, during the same period, reported no adverse effects.  (*Id.*)  The
Commissioner claims the ALJ accounted for credible side effects by limiting Williams to
simple, unskilled work involving one to two step tasks, low concentration, low memory,
and low stress.  (D.I. 13 at 16-17.)  The RFC finding, however, explicitly states these
restrictions are to accommodate her depression and anxiety.  (D.I. 5 at 17.)  Although
the ALJ acknowledged her reports of side effects (*id.* at 15), he never addressed
whether they cause any limitation.  Indeed, the ALJ makes no further mention of them
in his RFC finding.  While the finding suggests the ALJ was aware of the medication
issues, there is no evidence he considered them in rendering the RFC assessment.

For these reasons, the court concludes the ALJ's findings on ADLs and the side
effects of medication are unsupported by substantial evidence.  The RFC finding is
remanded for the ALJ to substantiate whether any bases exist for his findings regarding
Williams' ADLs, and any side effects and resulting limitations from her medication.

## V.     CONCLUSION

For the foregoing reasons, (1) Williams' motion for summary judgment is granted
in part and denied in part; (2) the Commissioner's motion for summary judgment is
granted in part and denied in part; and (3) the matter is remanded for further
proceedings consistent with the Memorandum.

Dated February 26, 2016

UNITED STATES DISTRICT JUDGE

25